IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

CORDARIOUS WILLIS,                                                                          PLAINTIFF
ADC #162742

v.                                              4:21CV00926-DPM-JTK

CHYNNA THOMAS, et al.                                                                       DEFENDANTS

**PROPOSED FINDINGS AND RECOMMENDATIONS**

**INSTRUCTIONS**

The following recommended disposition ("Recommendation") has been sent to Chief United States District Judge D.P. Marshall Jr. Any party may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objections; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

**DISPOSITION**

**I.    Introduction**

Cordarious Willis ("Plaintiff"), in custody at the Varner Supermax Unit ("VSM") of the Arkansas Division of Correction ("ADC"), filed a Complaint against Correctional Sergeant Chynna Thomas and Correctional Officer Roderick Johnson (collectively, "Defendants") in their personal and official capacities. (Doc. No. 2). Plaintiff, who says he suffers from asthma, alleges Defendants unlawfully sprayed him with a chemical agent, did not allow him to decontaminate, and denied him medical care after spraying him. (Id.). Plaintiff's claims are pending.

Defendants have filed a Motion for Summary Judgment. (Doc. Nos. 59-61). Plaintiff has responded, and Defendants have replied. (Doc. Nos. 67-72, 79, 81). For the reasons explained

below, the Court recommends Defendants' Motion for Summary Judgment be granted and Plaintiff's claims dismissed with prejudice.

## II.     Summary Judgment Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate if the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Dulany v. Carnahan, 132 F.3d 1234, 1237 (8th Cir. 1997). "The moving party bears the initial burden of identifying 'those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Webb v. Lawrence County, 144 F.3d 1131, 1134 (8th Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (other citations omitted)). "Once the moving party has met this burden, the non-moving party cannot simply rest on mere denials or allegations in the pleadings; rather, the non-movant 'must set forth specific facts showing that there is a genuine issue for trial.'" Id. at 1135. Although the facts are viewed in a light most favorable to the non-moving party, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." Id.

In addition, "[a]ll material facts set forth in the statement (of undisputed material facts) filed by the moving party...shall be deemed admitted unless controverted by the statement filed by the non-moving party . . . ." Local Rule 56.1, Rules of the United States District Court for the Eastern and Western Districts of Arkansas. Failure to properly support or address the moving party's assertion of fact can result in the fact considered as undisputed for purposes of the motion. FED. R. CIV. P. 56(e).

**III.    Discussion**

Plaintiff sued Defendants in their official and personal capacities alleging excessive force and deliberate indifference to his serious medical needs.

**A.    Official Capacity Claims**

As mentioned above, Plaintiff seeks damages. Plaintiff's § 1983 damages claim against Defendants in their official capacity is the equivalent of claims against the State of Arkansas and is barred by Eleventh Amendment. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989). Accordingly, summary judgment in Defendants' favor on Plaintiff's official capacity damages claim is appropriate.

**B.    Personal Capacity Claims**

Defendants maintain that there was no violation of Plaintiff's constitutional rights, and that they are entitled to qualified immunity.

**1.    Qualified Immunity**

Defendants ask the Court to dismiss Plaintiff's claims against them in their individual capacities based on qualified immunity. Qualified immunity shields a government official from liability when his conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity is a question of law, not a question of fact. McClendon v. Story County Sheriff's Office, 403 F.3d 510, 515 (8th Cir. 2005). Thus, issues concerning qualified immunity are appropriately resolved on summary judgment. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (the privilege is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial.").

To determine whether defendants are entitled to qualified immunity, courts generally consider two questions: (1) whether the facts alleged or shown, construed in the light most

3

favorable to the plaintiff, establish a violation of a constitutional or statutory right; and (2) whether that right was so clearly established that a reasonable official would have known that his or her actions were unlawful. Pearson v. Callahan, 555 U.S. 223, 232 (2009).[1] "'A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Thurmond v. Andrews, 972 F.3d 1007, 1012 (8th Cir. 2020) (internal citation omitted). In considering whether a right is clearly established, courts do not look at precedent "at a high level of generality." Id. Instead, courts "look for a controlling case or a robust consensus of cases of persuasive authority. There need not be a prior case directly on point, but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Id. (internal citation omitted). A defendant is entitled to qualified immunity only if no reasonable fact finder could answer both questions—whether the facts alleged or shown, construed in the light most favorable to the plaintiff, establish a violation of a constitutional or statutory right and whether that right was so clearly established that a reasonable official would have known that his or her actions were unlawful—in the affirmative. Nelson v. Correctional Medical Services, 583 F.3d 522, 528 (8th Cir. 2009).

    **2.    Excessive Force**

"After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Jackson v. Gutzmer, 866 F.3d 969, 974 (8th Cir. 2017). The core judicial inquiry in an excessive force claim is whether the force was used in a "good-faith effort to maintain or restore discipline, or was instead used maliciously and sadistically to cause harm." Flemons v. Devane, 779 Fed. Appx. 423, 425 (8th Cir. 2019) (per

---

[1]Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Nelson, 583 F.3d at 528 (quoting Pearson v. Callahan, 555 U.S. at 236).

4

curiam) (citing Wilkins v. Gaddy, 559 U.S. 34, 36-39 (2010)).  An officer acts maliciously when he takes a course of action, without just cause or reason, that was intended to injury the inmate.  United States v. Miller, 477 F.3d 644, 647 (8th Cir. 2007) (internal citations omitted).  An officer behaves sadistically if he acts with "extreme or excessive cruelty or by delighting in cruelty."  Id.

In making the inquiry whether an officer acted in good faith to restore or maintain discipline, or if the officer acted maliciously and sadistically to cause harm, courts consider: "the need for the application of force, the relationship between the need and the amount of force that was used, and the extent of the injury inflicted . . . ."  Jackson, 866 F.3d at 974.  Courts may also consider the threat reasonably perceived by the officer, and "any efforts used to diminish the severity of a forceful response."  Walker v. Bowersox, 526 F.3d 1186, 1188 (8th Cir. 2008).  Pain inflicted during a prison security measure is not cruel and unusual punishment only because in hindsight the degree of force used for security purposes was unreasonable.  Ward v. Smith, 844 F.3d 717, 721 (8th Cir. 2016) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)).  Rather, guards will be liable only "if they are completely unjustified in using force, i.e., they are using it maliciously and sadistically.'"  Id. (internal citation omitted).  "Whether the force used was reasonable is 'judged from the perspective of a reasonable officer on the scene' and in the light of the particular circumstances."  Story v. Norwood, 659 F.3d 680, 686 (8th Cir. 2011) (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)).

Even with malicious and sadistic motivation, not every use of physical force rises to the level of a constitutional violation.  Irving v. Dormire, 519 F.3d 441, 446 (8th Cir. 2008).  "The Eighth Amendment's prohibition of 'cruel and unusual' punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force . . . .'"  Hudson v. McMillian, 503 U.S. 1, 9-10 (1992).  But, "any use of force greater than *de minimis*, or any use of force that is 'repugnant to the conscience of mankind' does" constitute a violation.  Irving, 519 F.3d at 446.

There is no significant injury threshold in an excessive force claim. Wilkins v. Gaddy, 559 U.S. 34, 37 (2010). However, "[t]he extent of injury may . . . provide some indication of the amount of force applied." (Id.). Threats of death together with readily available means may "form the basis of an injury sufficiently serious to implicate the Eighth Amendment." Irving, 519 F.3d at 449.

***

The following facts are undisputed. (Doc. No. 61 at ¶¶ 1-39; Doc. No. 72).

In June 2021, Defendants were employed as correctional officers with the ADC and were assigned to work at VSM. In June 2021, Plaintiff was incarcerated at VSM. Plaintiff was housed in cellblock two, which is classified as "restrictive housing." Restrictive housing barracks are generally reserved for inmates who are excessively defiant, combative, potentially violent, and/or guilty of dashing[2] officers in the past. The cells in restrictive housing are single-man cells with large steel doors. The doors have a small glass window that allows officers to see in the cell, and inmates to see out of the cell. Because of security concerns, this window must remain free and clear at all times. The doors on restrictive housing cells also have an opening known as a "trap"; inmates may receive food, medicine, and other items through the trap. Inmates moving from restrictive housing to other parts of the prison, including a decontamination shower, must be restrained by handcuffs prior to movement.

Each restrictive housing cell has a toilet, sink, shower, and sprinkler. The water in each cell can be turned off only by using the "pipe key." The pipe key is kept by master control, can only be used by officers with the rank sergeant or above, and is for emergency purposes, such as when an inmate is flooding their cell. An inmate may flood their cell in a variety of ways, most

---

[2] Dashing is when an inmate assaults staff by throwing liquids on an officer, usually bodily fluids or another substance, and it is a serious violation of ADC policy and presents a threat to the safety of officers and the unit.

commonly by stuffing an item into the toilet and then flushing the toilet repeatedly until water overflows. Flooding presents a security risk and a health and safety risk to the unit because the water goes into other inmates' cells causing a disruption and poses a sanitation risk because the toilet water often contains bodily fluids. As such, it is crucial that staff stop flooding as soon as possible.

Prison officials must sometimes use chemical agents or other force to regain control or subdue an inmate who poses a risk to others or the unit. This force may be physical, in the form of chemical agents, by use of a TASER, or some other means, depending on the situation and defiance of the inmate. MK4, classified as an "irritant," is the least invasive chemical agent ADC officials may use when force is needed. MK4 is made from cayenne pepper (ground into an oil base) and water. MK4 is designed for one-on-one situations, and comes in a small can with a finger trigger. MK4 dispenses in stream form, not a fog or vapor, that must contact skin to be effective. MK4 leaves an orange residue after it is used. The ADC trains staff to deploy a one-to-three second burst of MK4 at a time. Decontamination after contact with MK4 requires only thoroughly rinsing with soap and water.

***

Plaintiff's claims arise from an incident that took place on June 27, 2021. The parties disagree about what happened that day.

Defendants' Version of Events

According to Defendants, on June 27, 2021, Plaintiff was upset that Officer Thomas was assigned to his cell; Plaintiff told officer Lieutenant Washington—not a party to this action—that Plaintiff was suicidal, and would flood his cell if Officer Thomas was not re-assigned to work in a different barracks. (Doc. No. 61 at ¶ 41; Doc. No. 59-5 at ¶ 5). Lieutenant Washington turned

7

off the water to Plaintiff's sprinkler, but left on the water for Plaintiff's toilet, sink, and shower. (Doc. No. 61 at ¶ 42; Doc. No. 59-5 at ¶ 6).

A few hours later, the control booth officer radioed for assistance because water was coming from Plaintiff's cell and spilling over onto the tier below and into the cells of other inmates. (Doc. No. 61 at ¶ 43; Doc. No. 59-3 at ¶¶ 4-6; Doc. No. 59-5 at ¶9).  Nearby cells were taking on water; inmates were yelling, banging on their doors, demanding the flooding stop, and shouting about their property being damaged.  (Doc. No. 61 at ¶ 44;  Doc. No. 59-5 at ¶ 9).  Defendants responded to the radio call at approximately 5:38 p.m. and began to investigate.  (Doc. No. 61 at ¶ 45;  Doc. No. 59-3 at ¶¶ 4-6; Doc. No. 59-4 at ¶¶ 4-6).

Plaintiff had blocked his glass window with paper, preventing Defendants from seeing him. (Doc. No. 59-3 at ¶ 8; Doc. No. 59-4 at ¶ 9).  Defendants could hear what sounded like Plaintiff repeatedly flushing his toilet.  (Doc. No. 61 at ¶ 46; Doc. No. 59-3 at ¶ 9; Doc. No. 59-4 at ¶ 10). Defendant Thomas and Defendant Johnson ordered Plaintiff to stop flooding his cell, but Plaintiff did not comply.   (Doc. No. 61 at ¶ 48; Doc. No. 59-3 at ¶¶ 10, 11; Doc. No. 59-4 at ¶¶ 11, 12).

Defendant Thomas called for the pipe key to turn off the water in Plaintiff's cell.  (Doc. No. 61 at ¶ 51; Doc. No. 59-3 at ¶ 13).  While waiting for the pipe key, Defendant Johnson opened Plaintiff's trap door to talk to Plaintiff.  (Doc. No. 61 at ¶ 52; Doc. No. 59-3 at ¶ 15; Doc. No. 59-4 at ¶ 13).  Defendant Johnson saw Plaintiff flushing his toilet.  (Doc. No. 61 at ¶ 53; Doc. No. 59-4 at ¶ 14).  Plaintiff then took a cup filled with an unknown substance and hurled it at the door in an attempt to dash Defendant Johnson.  (Doc. No. 61 at ¶ 54; Doc. No. 59-4 at ¶ 15).  Defendant Johnson backed away from the trap before anything splashed on him.  (Doc. No. 61 at ¶ 55; Doc. No. 59-4 at ¶ 15).  At that time, Defendant Johnson deployed a two-to-three second burst of pepper spray into Plaintiff's cell in an attempt to regain control of Plaintiff. (Doc. No. 61 at ¶ 56; Doc. No. 59-3 at ¶ 17; Doc. No. 59-4 at ¶ 16).  Defendant Thomas did not order Defendant Johnson to

use pepper spray, and did not use pepper spray against Plaintiff. (Doc. No. 61 at ¶ 57; Doc. No. Doc. No. 59-3 at ¶ 18). The pepper spray did not hit Plaintiff. (Doc. No. 61 at ¶ 58; Doc. No. 59-4 at ¶ 17).

Plaintiff's Version of Events

According to Plaintiff, he reported to shift supervisor Lieutenant Washington—not a party to this action—that his toilet and shower were malfunctioning and the water would not turn off, but Defendant Washington said he did not care and ignored the problem. (Doc. No. 69 at 2; Doc. No. 70 at 2).

Plaintiff does not dispute that Defendant Thomas was in cellblock 2 on the night of June 27, 2021, but Plaintiff disputes that she was assigned to that area. (Doc. No. 72 at 1). Plaintiff denies telling Officer Washington that Plaintiff was suicidal and would flood his cell if Defendant Thomas was not assigned to a different barracks. (Id.). Plaintiff contests that Lieutenant Washington turned off the water to the sprinkler in Plaintiff's cell, "[b]ecause only the maintenance crew can turn off the sprinkler system." (Id. at 2). Plaintiff also contests that the control booth officer called for assistance because water was coming out of Plaintiff's cell. (Id.). According to Plaintiff, his cell was in a location that could not be seen by the control booth officer. (Id.).

Plaintiff objects to Defendants' statement that other inmates were yelling, banging on their doors, and demanding that the flooding stop because in Defendants' original use of force report, Defendants said Plaintiff was the one yelling and banging on his cell door. (Id.). Plaintiff further objects to Defendants' statement that he was combative and threatening, also because that was not included in Defendants' original use of force report. (Doc. No. 72 at 4).

Plaintiff points out that in Defendant Thomas's responses to Plaintiff's first set of interrogatories, Defendant Thomas stated that Defendant Johnson opened Plaintiff's trap because Plaintiff was making threats to destroy his sprinkler. (Id.). Plaintiff objects to Defendants'

9

statement that Defendant Johnson opened Plaintiff's trap to talk directly to Plaintiff because of the discrepancy Plaintiff perceives between Defendant Thomas's interrogatory response. (Id.).

Plaintiff contests that Defendant Johnson observed Plaintiff continuing to flush his toilet because Plaintiff "had paper covering [his] cell window." (Id. at 3). Plaintiff also contests Defendants' statement that he hurled a cup with an unknown substance towards Defendant Johnson, because Defendants "originally stated that I attempted to throw an unknown substance out of my trap," and because there was a safety rail in front of Plaintiff's cell that would have prohibited Defendant Johnson from backing away. (Id. at 4-5). (See also Doc. No. 69 at 2; Doc. No. 70 at 1) (Plaintiff denies attempting to thrown anything out of his trap).

Plaintiff also contests that Defendant Johnson used only one burst of pepper spray. (Doc. No. 72 at 5). During Plaintiff's deposition, he testified that Defendant Johnson sprayed an entire can of pepper spray into Plaintiff's cell. (Doc. No. 81-1 at 32:18-32:22). In support of Plaintiff's response, Plaintiff offered the sworn statement of inmate Steven Henderson,[3] who says he

---

[3] Defendants urge the Court to disregard the declaration because the declaration is undated and was not disclosed during discovery.

"Fed. R. Civ. P. 26 states that a party, upon learning that its disclosure is incorrect or incomplete, must supplement or correct its disclosure in a timely manner." Lacey v. Norac, Inc., 932 F.3d 657, 660 (8th Cir. 2019).

On August 15, 2022, Defendants filed a Motion to Compel. (Doc. No. 34). Attached to Defendants' Motion is Defendants' First Set of Interrogatories and Requests for Production. (Doc. No. 34-1 at 2). Interrogatory No. 1 reads: "Please state the name, telephone number and address of each individual . . . likely to have discoverable information relevant to the facts or allegations in this case . . . ." (Id.). Interrogatory No. 2 requests the name of each person Plaintiff may call as a witness in this case, and the subject matter to which each person will testify. (Id. at 2-3). Interrogatory No. 4 asks Plaintiff to identify each document he intends to introduce as evidence at trial. (Id. at 4). Request for Production No. 2 asks for a copy of each such document. (Id.). Interrogatory No. 5 asks Plaintiff whether he has obtained a statement from any person regarding the allegations Plaintiff makes in this case, and, if so, the name and contact information for each person. (Id.). Request for Production No. 5 asks for a copy of all such statements. (Doc. No. 34-1 at 5).

Defendants' discovery requests encompass the statement given by Mr. Henderson. Yet Plaintiff did not produce Mr. Henderson's identity or declaration as a supplement to Plaintiff's

witnessed Defendant Johnson spray four long bursts of pepper spray into Plaintiff's cell, after which Plaintiff yelled that he surrendered and could not breathe. (Doc. No. 67 at 83). According to the declaration, Defendants Thomas and Johnson then walked out of the cellblock "laughing and joking about how they hoped inmate Willis died from a[n] asthma attack." (Id.). Mr. Henderson "also witnessed [Defendants] leave inmate Willis in his cell for almost two hours before they finally allowed officers to remove him from his cell." (Id.).

According to Plaintiff, because Defendant Thomas went and got the pepper spray and gave it to Defendant Johnson, Defendant Thomas "basically gave [Defendant Johnson] permission to spray [Plaintiff]." (Doc. No. 72 at 5). Plaintiff also maintains that chemical agents "hit [his] blanket while [he] was laying on [his] rack which is [his] bed." (Id. at 5). Plaintiff contests that he refused to be escorted by Defendants based on the fact that Defendants had earlier said he complied after he was given a direct order to submit to restraints. (Id. at 6). Lastly, Plaintiff disagrees that he was seen by Nurse Cunningham at his cell at approximately 6:45 p.m. on June 27, 2021. (Id.). Plaintiff grounds his disagreement in the fact that Deputy Director Reed, in a decision on a grievance appeal, wrote "that all of [Plaintiff's] allegations were true in response to [Plaintiff] being denied medical treatment and because inmate Steven Henderson witnessed both Defendants deny [Plaintiff] medical treatment." (Id.).

---

discovery responses; Defendants first became aware of Mr. Henderson and the declaration at the time Plaintiff filed his Response.

"[U]nder Federal Rule of Civil Procedure 37(c)(1), evidence not disclosed under Rule 26(a) is admissible if harmless." Shuck v. CNH Am., LLC, 498 F.3d 868, 874 (8th Cir. 2007). Otherwise, "the party is not allowed to use that information or witness to supply evidence on a motion . . . ." FED. R. CIV. P. 37(c)(1).

For the purposes of this Motion, the Court finds Mr. Henderson's declaration is harmless because Plaintiff testified Defendant Thomas used an entire can of pepper spray, where Mr. Henderson's declaration limits the use to a few bursts, and Plaintiff did not contest that the spray disbursed in a stream, not a fog or vapor. And Plaintiff did not contest that Defendants called medical—did not ignore Plaintiff's medical needs—after the spray was used.

11

Plaintiff does not contest that once the source of the flooding had ceased, Defendants left the barracks, called for back-up, and notified medical that Plaintiff needed attention. (Doc. No. 61 at ¶ 64; Doc. No. 72). Plaintiff also does not dispute that at approximately 6:15 p.m. two officers who are not parties to this action escorted Plaintiff to the Isolation 4 shower where he was allowed to decontaminate. (Doc. No. 61 at ¶ 65; Doc. No. 72).

<u>No Material Facts in Dispute</u>

As mentioned above, "in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit." Webb v. Lawrence County, 144 F.3d 1131, 1135 (8th Cir. 1998) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (other citations omitted)).

While Plaintiff denies flooding his cell, he does not dispute that water coming from his cell was flooding the area. (See Doc. No. 81-1 at 18:19-19:12, for example). Indeed, Plaintiff had reported that the water in his toilet and shower would not stop running. Plaintiff claims that when Defendants came to his cell, they "just started harassing [him] and talking a bunch of ignorant, dumb s**t . . . ." (Id. at 19:5-19:9). In response, Plaintiff told Defendant Johnson that he shot "the last b***h a*s ni***r that called [him] a b***h." (Id. at 29:11-29:15). Defendant Johnson allegedly told Plaintiff that he would "whoop [Plaintiff's] a*s," and Plaintiff told Defendant Johnson that he would "kill him if he put his hands on [Plaintiff] and [Plaintiff] meant it." (Id. at 28:24-29:5). While Plaintiff was threatening Defendant Johnson, Defendant Thomas told Plaintiff to stop before Plaintiff "got wrote up." (Id. at 30:3-30:9). Plaintiff testified that he responded to Defendant Thomas: "I ain't give a f**k." (Id. at 30:9). Defendant Thomas told Plaintiff that "they were about to gas [Plaintiff]." Defendant Thomas then went to get the pepper spray and a mask.

(Doc. No. 81-1 at 30:12-30:18). Plaintiff denies throwing anything toward his cell door. (Id. at 31:4-31:21). Defendant Johnson deployed the pepper spray.

Plaintiff, who was confined in restrictive housing on June 27, 2021, concedes that inmates in restrictive housing are housed in single-man cells with large steel doors. (Doc. No. 61 at ¶¶ 7, 10; Doc. No. 72) (see also Doc. No. 59-8) (video of cellblock 2). The glass window and the trap are the only ways to see into restrictive housing cells. (See Doc. No. 59-8). Plaintiff does not contest that his cell had a small, glass window that allows officers to see in the cell. (Doc. Nos. 61 at ¶ 11; Doc. No. 72). Plaintiff also does not contest that, due to security concerns, the window must remain free and clear at all times. (Doc. No. 61 at ¶ 12; Doc. No. 72). Additionally, Plaintiff does not contest that Plaintiff had blocked the glass window in his cell with paper. (Doc. No. 61 at ¶ 46; Doc. No. 72). Plaintiff contests that Defendant Johnson opened Plaintiff's trap door and witnessed Plaintiff flushing his toilet. (Doc. No. 61 at ¶¶ 52-53; Doc. No. 72 at pg. 4).

Plaintiff testified that he had gone to his bed and covered up with a blanket by the time Defendant Johnson, without warning, "opened [Plaintiff's] trap and sprayed it all in there." (Doc. No. 81-1 at 33:1-33:11; 41:13-41:21). Plaintiff explained that

> from the edited version of the camera that they – that I was allowed to see back in June, it even shows when I came out of my cell and I didn't have any type of spray up on me. The spray was just allover. It was like I had a bunch of books, my hygiene stuff. I had some clothes and all that there on the table and then other things I had like neatly stacked up on the floor. Like they were just pepper spraying all over my property, all over the floor.

(Id. at 33:24-34:7).

Plaintiff confirmed that he was not sprayed directly in the face. (Id. at 41:13-41:21). According to Plaintiff, "[t]he pepper spray that actually got up on my skin was due to me like when I got up out of the bed, when I got up out of the bed, I kind of leaned up against the wall because I kind of almost fell and like there was pepper spray on the wall, so some of it got on my skin and

13

stuff." (Id. at 41:13-41:21). Plaintiff described the spray that was used as reddish orange. (Id. at 41:7-41:12).

Plaintiff maintains that because he was not an immediate threat to himself, other inmates, or security, Defendant Johnson was purposely trying to harm Plaintiff by deploying chemical spray. (Id. at 35:25-36:11). According to Plaintiff, as a result of the pepper spray his skin was burning and he vomited. (Id. at 37:9-38:1).

In support of their Motion, Defendants submitted video footage of cellblock 2. The video includes the time when Plaintiff is escorted out of cellblock 2 and into the cellblock 2 bullpen. (Doc. Nos. 59-8; 59-9). Little of what happened near Plaintiff's cell, 77, is clear from the video Defendants submitted. (Doc. No. 59-8). But from what can be seen, Plaintiff is dressed in a white long-sleeve shirt with a short-sleeve white crew-neck t-shirt over the long-sleeve shirt, white pants, and white tennis shoes. (Doc. Nos. 59-8, 59-9). No orange residue—Plaintiff agreed the spray leaves an orange residue—is visible on Plaintiff's white clothing. This is consistent with Plaintiff's account that the pepper spray did not hit him. The only areas of exposed skin are on Plaintiff's hands, neck, and head. (Doc. Nos. 59-8, 59-9). There is no orange residue visible on Plaintiff's skin, either. (Doc. Nos. 59-8, 59-9 ).

The Court of Appeals for the Eighth Circuit has, on occasion, denied summary judgment in excessive force claims involving pepper spray. As explained by the Eighth Circuit, "the few cases where we denied summary judgment in Eighth Amendment excessive force claims based on pepper spraying have involved no warning this force would be used, no apparent purpose other than inflicting pain, use of unnecessary 'super-soaker' quantities of the chemical, refusal to allow the victim to wash off the painful chemical for days, and/or use of additional physical force." Martz v. Barnes, 787 F. App'x 356, 358 (8th Cir. 2019).

Here, water was coming from Plaintiff's cell. Plaintiff did not contest that flooding presents a security risk and a health risk to the unit. (Doc. No. 61 at ¶ 3; Doc. No. 72). Plaintiff says he reported to Lieutenant Washington that Plaintiff's shower and toilet were not working properly and would not stop running, to no avail. Plaintiff's steel cell door was closed, the window in the door was covered with paper, and Plaintiff's trap was closed. As such, the goings-on inside of the cell were not visible, unless a Defendant opened and looked through Plaintiff's trap. Plaintiff denies that Defendant Johnson opened Plaintiff's trap and looked inside. Accepting that as true, neither Defendant Johnson nor Defendant Thomas could know what was transpiring inside the cell. Plaintiff did not contest that Defendants heard water flowing.

After Defendants Thomas and Johnson reached Plaintiff's cell, words were exchanged. Plaintiff went so far as to threaten Defendant Johnson's life if Defendant Johnson put his hands on Plaintiff. Defendant Thomas told Plaintiff to stop or Plaintiff would be written up. Plaintiff responded that he did not give a f**k. Defendant Thomas warned Plaintiff that "they were about to gas [Plaintiff]." Defendant Thomas then retrieved the spray, but did not use the spray. Defendant Johnson opened Plaintiff's trap and sprayed the pepper spray inside. Plaintiff was not hit by the spray, which disbursed as a stream—not a fog or vapor—and had to come in contact with skin to be effective.

Even if one or both Defendants violated Plaintiff's Eighth Amendment rights, the Court is not aware of—and Plaintiff did not cite—a substantially similar case that would clearly establish that Defendants' use of pepper spray in this situation was unlawful. As such, Defendants are entitled to qualified immunity. Accordingly, summary judgment should be entered in Defendants' favor on Plaintiff's excessive force claims.

The Court notes that Plaintiff attempts to create genuine issues of material fact by dissecting and comparing information in various documents. (Doc. No. 67 at 13-15, for example).

15

The Court does not find these disputes material. And to the extent Plaintiff has alleged falsified documents, he provided no evidence beyond his own statements.

### 3. Deliberate Indifference to Serious Medical Needs

The Eighth Amendment prohibits cruel and unusual punishment. U.S. CONST. AMEND. VIII. This prohibition gives rise to the government's duty to provide medical care to prisoners. "The government has an 'obligation to provide medical care for those whom it is punishing by incarceration." Allard v. Baldwin, 779 F.3d 768, 772 (8th Cir. 2015) (citing Estelle v. Gamble, 429 U.S. 97, 103 (1976)). It follows that the "Eighth Amendment proscribes deliberate indifference to the serious medical needs of prisoners." Robinson v. Hager, 292 F.3d 560, 563 (8th Cir. 2002) (internal citation omitted). "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" Schuab v. VonWald, 638 F.3d 905, 914 (8th Cir. 2011) (internal citation omitted). "Deliberate indifference may be demonstrated by prison guards who intentionally deny or delay access to medical care or intentionally interfere with prescribed treatment, or by prison doctors who fail to respond to prisoner's serious medical needs." Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997). To succeed on a claim of deliberate indifference to a medical need, a plaintiff must show he had an objectively serious medical need and prison officials had actual knowledge of, but deliberately disregarded, that need. See Washington v. Denney, 900 F.3d 549, 559 (8th Cir. 2018); McRaven v. Sanders, 577 F.3d 974, 981 (8th 2009).

Plaintiff alleges Defendants were deliberately indifferent because Defendants did not allow him to decontaminate for approximately two hours. The Court notes that in a grievance dated June 27, 2021 Plaintiff complained that Defendants "walked away from [Plaintiff's] cell door and left

[Plaintiff] unsupervised from approximately 6:30 pm to approximately 7:30 p.m." when Plaintiff was taken to Isolation 4 to decontaminate. (Doc. No. 2 at 24).

As set out above, Plaintiff was not hit by the pepper spray; the spray disbursed as a stream, not a fog, and Plaintiff was under his blanket when it was sprayed. The spray was effective only upon contact with skin. Plaintiff claimed he got the spray on his skin when he rubbed against his cell's wall. Only the skin on Plaintiff's hands, neck, and face was exposed. Plaintiff did not contest that after the spray was used, Defendants left the area and alerted medical. (Doc. No. 61 at ¶ 64; Doc. No. 72). Plaintiff also does not dispute that an approximately 6:15 p.m. two officers who are not parties to this action escorted Plaintiff to the Isolation 4 shower where he was allowed to decontaminate. (Doc. No. 61 at ¶ 65; Doc. No. 72).

Video submitted by Defendants show Plaintiff being escorted out of cellblock 2, where Plaintiff was housed, at approximately 6:19 p.m. (Doc. No. 59-8). This is approximately 41 minutes after the control booth alerted Defendants Thomas and Johnson of flooding in cellblock 2. Medical records from June 27, 2021 at 6:45 p.m. reflect that Plaintiff's "face, nares, and eyes are of normal color. His face, head, and nares are clean and clear. He is also breathing without difficulty at this moment." (Doc. No. 59-7 at 19).

Plaintiff has not offered admissible evidence beyond his own testimony in support of his deliberate indifference claim. Plaintiff did not contest that Defendants alerted medical when they left his cell. Defendants left Plaintiff's cell before Plaintiff was escorted out of cellblock 2, and Plaintiff was escorted out of cellblock 2 by other officers, not Defendants. Nothing in record suggests Defendants were deliberately indifferent to Plaintiff's serious medical needs. The Court recommends summary judgment be granted in Defendants' favor on Plaintiff's deliberate indifference to serious medical needs claim.

## IV. Conclusion

IT IS, THEREFORE, RECOMMENDED that:

1. Defendants' Motion for Summary Judgment (Doc. No. 59) be GRANTED and

2. Plaintiff's claims be DISMISSED with prejudice.

Dated this 11th day of January, 2023.

_____
JEROME T. KEARNEY
UNITED STATES MAGISTRATE JUDGE